---

## 4463.  *In re* FITE.

1. An answer to a rule for contempt in the writing and publication of an article in a daily newspaper, containing an allegation that the publication of the article in question "is within the rights and privileges guaranteed by the constitution, article 1, section 1, paragraph 15, which declares that any person may speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that liberty," presents no question of a constitutional character for certification by this court to the Supreme Court.  It does not involve a "construction of a provision of the constitution of this State or of the United States," or "the constitutionality of an act of the General Assembly."

2. The power to punish summarily for contempt is incident to courts of record, and to try a case of contempt without the intervention of a jury violates no constitutional provision.  As to courts created by the constitution, the right to define contempts can not be abridged or taken away by legislative action.  The Court of Appeals of Georgia is a constitutional court.

3. Only the court offended or scandalized by a criminal contempt, or whose authority is defied, has power to punish for the contempt, or to entertain proceedings to that end.

4. A criminal contempt is an act committed against the court as an agency of the government, and as to this class of contempts the public is primarily interested.  A contempt of this character may consist in "speaking or writing contemptuously of the court, or Judges acting in their judicial capacity."  Contempts of this character need not relate to a cause that is still pending in the court.

5. A case decided in the Court of Appeals remains pending therein until the adjournment of the term at which the decision was rendered, unless the remittitur has been transmitted to the trial court.  Until then the judgment of the reviewing court is subject to be modified or entirely changed, on motion of either party for a rehearing, timely filed, or by the court ex mero motu.

6. The constitutional right of freedom of speech or of the press was not intended as a refuge for the contemner or slanderer or libeler.  Contempt of the court, slander, and libel constitute *abuses* of the privilege, for the commission of which the offenders are justly and lawfully punishable.

7. The meaning and intent of a published article are to be determined by

a fair interpretation of the language used, and when the only construction of the language used is that it is offensive and contemptuous, a mere statement by the writer or publisher that no disrespect to the court or the Judges was intended furnishes no reason for discharging the rule for contempt.

8. On a trial for contempt in writing and publishing a newspaper article, a subsequent article written and published by the respondent, relating to the same subject-matter, and which in substance repeats the offense for which he is on trial, is admissible in evidence, as illustrative of the question of intent.

9. The fact that the respondent is himself a judge of a superior court of this State, and that the article written and published by him contains a criticism of a decision of the Court of Appeals in the exercise of its constitutional function in reviewing and reversing his judgment, constitutes no reason why he should be exempt from punishment for contempt. The article now under consideration was written and published by the respondent while occupying the position of judge of the superior court, scandalizing the judicial action of the reviewing court, reflecting upon the character of the Judges in their judicial capacity, and tending to bring the court itself, as well as the Judges thereof, into contempt and disrepute, and the position of the respondent not only does not excuse his offense, but is a fact of great aggravation.

10. The article written and published by the respondent in the Atlanta Constitution, October 5th, 1912, constitutes a flagrant criminal contempt of this court, and of the Judges thereof acting in their judicial capacity, and the answer sets up no facts of excuse or mitigation.

DECIDED OCTOBER 12, 1912.

Attachment for contempt.

On October 7, 1912, the Court of Appeals passed an order as follows: "It being made to appear to this court that Augustus W. Fite, one of the judges of the superior courts of this State, whose decisions are subject to review by this court, did write and cause to be published on October 5, 1912, in the Atlanta Daily Constitution, a newspaper of general circulation, published in Atlanta, Georgia, an article, a copy of which is hereto attached; and it further appearing that the said article was delivered to and read by the Judges of this court during the March term, 1912, thereof, and before the adjournment of said term, and before the remittitur from this court in the case referred to in said article had been transmitted to the trial court; and it further appearing that said article was so written and published while the case therein referred to was still pending in this court; and it further appearing that the language of said article has a tendency to impede, embarrass, and obstruct this court in the due administration of justice therein, and contains a false and defamatory reflection upon the judicial

integrity of this court: it is therefore ordered that a copy of this order, with the article attached, be served by the sheriff of this court upon the said Augustus W. Fite, personally, and he be and is hereby directed to appear in person before the bar of this court on Saturday morning, October 12, 1912, at 10 o'clock, then and there to show cause, if any he has, why he should not be dealt with as for contempt."

The newspaper article referred to in this order is as follows:

Editor Constitution: I have just read the headnotes of the decision of the Court of Appeals, again reversing the McCullough assault to rape case from Gordon county, referred to in The Constitution of the 2d instant, and find that the reversal is based upon a pitiful misconception and misconstruction of the record, which shows the utter inability of the Court of Appeals, and especially of the judge delivering the opinion, to comprehend the record or to render a proper decision in the case, if they so desired.

The first reversal was for the alleged reason that I did not give counsel for the defendant time to poll the jury before pronouncing sentence, although the jury was polled immediately after sentence was pronounced. The case was tried the second time on substantially the same facts as the first, but this time the jury was polled. The case was then carried to the Court of Appeals on substantially the same allegations of error as the first, except as to the polling of. the jury, and the court has again reversed the case, but in order to do so they had to reverse themselves, having sustained me on all the other allegations of error then made; but I am not surprised at this, for they are as apt to reverse themselves as they are to reverse me or the Supreme Court, which they frequently do with great complacency, and even sometimes graciously apologizing for doing so.

On the second trial I gave the same charge and refused the same requests that I gave and refused to give on the first trial, and the Court of Appeals held that neither my charge nor refusal to charge was error, but now they hold and reverse the case in part because it was error to refuse to give the request to charge that I had refused to give on the first trial. On this subject the Court of Appeals then said (second headnote), "Where the general charge to the jury embodies in substance legal principles contained in written requests to charge, any error in refusing the request to charge is harmless." Now they say, as to the same request (part of first headnote), "It is error to refuse to charge the jury that if the assailant, at the time the assault was committed, intended to desist as soon as he ascertained that the woman assailed would not consent, he would not be guilty of an assault with intent to rape." On this subject I had already charged as follows: "Now, gentlemen, I charge you this: If you believe from the evidence that the defendant took hold of Mrs. Fowler, intending then and there to have carnal knowldege of her forcibly and against her will, he would be guilty of the main charge, although he may have immediately desisted therefrom from fear or otherwise. I charge you further that

if you find he intentionally took hold of Mrs. Fowler, not intending to have carnal knowledge of her forcibly and against her will, but for any other reason, he would be guilty of the offense of assault and battery. But if you find from the evidence that he did not take hold of her at all, but accidentally touched her, he would not be guilty of any ·offense." The difference between the charge and the request is about the ·same as the difference between "tweedledee" and "tweedledum."

Again, they say in substance that I erred in not allowing the defendant to show that he did not flee, but went to his home on the farm and remained there, and was there the next day when the officers went· there to arrest him, and did not attempt to escape; when in truth and in fact, and the record shows it, I did allow him to prove all these things, but refused to allow him to take up the time of the court to prove that he was in the back yard playing with a pet squirrel up a tree, ·and such frivolous matters.

And, again, they say in substance that I erred in not allowing the ·defendant to prove the sayings of the prosecutor, Mr. Fowler, who was ·also a witness in the case; when in truth and in fact, and the record shows it, I allowed the defendant to prove all the sayings of Mr. Fowler, but refused to allow a witness to testify what he had heard that Mr. Fowler had said to others, which was simply hearsay evidence, and ·clearly inadmissible. For these alleged and frivolous reasons I am again forced to try the negro, and the good woman must again face the crowd· ·and tell the jury the story of the brutal assault upon her. No wonder our people are losing faith in some of our reviewing courts.

One thing further, the facts of the case are not correctly stated by your reporter,. but I am sure he did not mean to prejudice' the case in favor of the negro, as I fear the Court of Appeals has either wittingly or unwittingly done, where the facts and parties are not known.

I do not know what effect these reversals have had or may have, but I do know that since the first reversal about a year ago I have tried five similar cases, more than in the ten previous years, and there are some who say and believe that the recent Plainville riot, which occurred near where the McCullough crime was committed, was the result of that reversal.

The real reason for the reversals has never been given. The truth is that the Court of Appeals don't believe that a negro should be punished twenty years in the penitentiary for an assault 'to rape on the wife of a humble farmer, but I put them on notice that I do not agree with them, and that I will continue to do my duty as long as the juries continue to do their duties.        · Yours truly, A. W. Fite.

On October 12, 1912, the respondent appeared before the Court of Appeals, with his counsel, Messrs. Thomas W. Milner, J. M. Neel, Sam P.·Maddox, George F. Gober, and J. H. Wikle, and filed his answer. The court announced that two members of the bar of the court, Messrs. Samuel B. Adams and Andrew J. Cobb, as officers of the court, had been designated by it to act as its advisers. The answer was as follows:

"And now comes respondent and, in answer to the rule nisi in the above-stated case, respectfully shows as follows: It is true that he did write and cause to be published on October 5, 1912, in the Atlanta Daily Constitution, an article, a copy of which is attached to said rule nisi. Respondent further says that said article was written and published as aforesaid after the decision of this court in the McCullough case had been rendered and promulgated by this court, and notice thereof published in the Atlanta Journal and the Atlanta Daily Constitution as follows: Atlanta Journal, October 2, 1912: 'Judge Fite reversed by court once more. Court of Appeals holds sentence of twenty years was excessive.*—For the second time the Court of Appeals has reversed Judge A. W. Fite, of the Cherokee circuit, in the sentence of twenty years meted out by him to a negro named McCullough, who was convicted of assault with criminal intent. In the first instance the case was sent back to the lower court because of Judge Fite's alleged unwarranted haste in announcing sentence, it being charged that immediately upon the jury bringing in a verdict of guilty, and before the jurors could be polled, Judge Fite had sentenced the negro to twenty years in the penitentiary. Caustic criticism of Judge Fite was included in the opinion written by Judge Ben Hill, the presiding Judge of the appellate court. A new trial was given the negro, and he was again found guilty. Judge Fite once more sentenced him to twenty years. The Court of Appeals now holds that this sentence was excessive. The evidence in the case was to the effect that a negro placed his hands upon a white woman who was standing beside him.' Atlanta Daily Constitution, October 3, 1912: 'Judge Fite reversed twice in same case.—The Court of Appeals has again reversed the sentence of Judge A. W. Fite, of the Cherokee circuit, imposed on a negro named McCullough, who was tried and convicted on a charge of assault with criminal intent. Judge Fite, it appears, imposed a sentence of twenty years immediately after the jury returned a verdict of guilty against the negro. When the case was brought to the Court of Appeals to set aside the sentence, Judge Ben Hill, the presiding Judge of the appellate court, severely criticised the sentence of Judge Fite and sent the case back. The negro was given a new trial, and he was again convicted, and again Judge Fite imposed a sentence of twenty years. The court

---

*NOTE. The court did not so hold. See *McCullough* v. *State*, ante, 612.

reversed the decision on the ground that Judge Fite had excluded evidence and refused the request of the defense to make certain charges to the jury. The evidence in the case was to the effect that the negro placed his hands on a white woman who was standing beside him.' And [respondent's said article was written] after the headnotes of said decision had been furnished respondent at his request by the solicitor-general of the Cherokee circuit.

"In making this answer, respondent is ignoring the unofficial suggestion which has been made by some newspapers that there is, or has been, any personal difference between any of the members of this honorable court and your respondent. If it were true that such difference ever had existed, it would be beneath the dignity of the high office which your respondent holds to be in any way guided or influenced by the same in this proceeding, and your respondent hopes that this honorable court will cheerfully concur with him in dismissing such suggestion as wholly without the scope of this inquiry, and without sufficient importance to be either affirmed or denied.

"Your respondent has for the past sixteen years been honored by the good people of the Cherokee circuit with the position of trial judge of its courts. This tenure in office has accentuated your respondent's natural respect for law and order and his respect for the duly constituted officers of the law. Wherever exact justice is done, it necessarily tends to strengthen and deepen the respect of all of our people for the laws of our land and for the officers and courts who administer that law. Your respondent believes that in this proceeding this honorable court should be more than ordinarily anxious to do exact justice between your respondent and the laws of Georgia which this honorable court represents. It is quite necessary that all the steps leading up to the publication of the aforesaid article should be carefully and judicially considered by this honorable court, in order that it may thoroughly understand and appreciate the full circumstances under which the aforesaid article was written in an effort to maintain the respect of our people, and particularly those who are familiar personally with the McCullough case for the laws of our land and constituted authorities.

"At the first trial of this case in Gordon county there was considerable suppressed excitement, and your respondent was more

than ordinarily anxious that nothing should happen which would prevent the due administration of the law, and was anxious to do anything that would forestall any one from attempting to take the law in his own hands. The jury in said case returned their verdict of guilty during the progress of another case then on trial. As soon as the verdict was read this respondent immediately announced 'Twenty years in the penitentiary,' and directed the sheriff to carry defendant back to jail, and then turned to counsel engaged in the trial of the other case, and told them to proceed with that case. This was done with a view of preventing any demonstration, disturbance, or even a grosser violation of the law. It did not at that time occur to your respondent that he was cutting off any positive legal right of the defendant, such as having the jury polled. Respondent has been on the bench sixteen years, and the exercise of the right of polling a jury has hardly occurred as many as sixteen times in all the courts of the Cherokee circuit during that time. Unquestionably it is a right which the defendant has. Practitioners of this State, only in very rare instances, exercise the right, and it is one that never occurs to your respondent until it is requested by some of the counsel in the case. The exercise of the right is even now in Georgia looked upon by a large majority of our best practitioners as a serious mistake, on account of the indignation which it often arouses in the minds of the jurors being polled and the citizens present. It is a right which, when requested, is always allowed, and had it not been for the exigencies of this case, and the fact that your respondent's mind was on a more serious phase of the case than the mere right to poll a jury, there would have been plenty of time, if in fact there was not, for defendant's counsel to have had his request granted for defendant, if he had so desired, before sentence was imposed. The record does not show that counsel for defendant did not have time to ask for the polling of the jury, except as may be inferred from the word 'immediately.'

"In the discussion of this feature of the trial of the first case, this honorable court stated, 'The manner in which the sentence was imposed was unusual. It was in striking variance from that orderly judicial procedure which has generally characterized the conduct of judges in imposing sentences in cases of such gravity. In a practice of thirty-five years, twelve years of which was as

prosecuting attorney, the writer never knew the presiding judge to impose a sentence of such severity in a case of such grave character without first asking counsel and accused if there was any reason why sentence should not then be imposed, and he has never known the presiding judge in the slightest degree to interfere or prevent the full exercise of the right of the accused to poll, the jury after the verdict had been published, or by word or deed to impair the possible value in the exercise of such right. This very unusual conduct of the judge must therefore have made a strong impression upon the mind of each one of the jurors, for it is altogether probable that they had never before seen it occur in court, a place where "justice is judicially administered." ' Court of Appeals Reports, Vol. 10, page 406. Again, on page 408, same volume, this honorable court says: 'In courts of justice, where order and deliberation should characterize every step of judicial procedure, no necessity should be created for an unseemly contest between the presiding judge and counsel for the accused. The attorney should not be required to be acutely on the alert to precipitately, and immediately upon the reading of a verdict, jump to his feet and demand the right to poll the jury, for fear that the presiding judge might destroy this right by the too quick imposition of sentence.'

"It is probable that this honorable court did not recognize, as did your respondent, the necessity for prompt and immediate action upon the rendition of the verdict, or the existence of such necessity as a reason why this respondent overlooked the right in defendant of having the jury in that case polled, if he so desired. It will be recalled that this decision was quoted at length in the daily papers of the State, with various criticisms of the same, not all of which were calculated to engender in the public mind that respect for your respondent as a court, so essential to every trial court who directly seeks to administer justice to the litigants in his circuit.

"In the decision rendered by this honorable court, where many assignments of error were made with reference to the charge and the refusal of the court to charge requests, all of the actions of your respondent were approved by this honorable court, with the exception of allowing the defendant to poll the jury. The case was again tried in Gordon county, and in conformity to the decision handed down by this honorable court, your respondent refused all

requests which he had previously refused, and gave in charge to the jury the same charge which he had previously given, and allowed the defendant to poll the jury. Your respondent necessarily assumed that having followed the instructions of this honorable court in the prior case, the evidence being substantially the same, that the second verdict of the jury would be final and your respondent's judgment therein would be approved. The recent decision handed down herein by this honorable court, reversing the case on the ground therein stated, and first on account of the failure of this respondent to grant a request to charge which had previously been refused, necessarily brought to respondent's mind the entire history of the case, the words and effect of the decision above quoted, the natural fallibility of all human agencies, and the universal demand for the passage of a law which will permit courts to shorten litigation, affirm verdicts and judgments, where substantial justice has been done, by brushing aside technicalities strenuously insisted upon by ardent and necessarily partisan counsel.

"To be as specific as possible with reference to the article published, respondent refers to the following parts, to wit: Where it is said that the 'reversal is based upon a pitiful misconception and misconstruction of the record,' the word 'pitiful' should not have been used, and the intention was only to show that the two records in the same case being substantially the same, the judgment in the first case should control. Your respondent says further that, as a matter of justice to the Judge who delivered the opinion, as well as to himself, when he wrote the aforesaid article he did not know what Judge had delivered the opinion, as the copy of the headnotes, furnished by the solicitor-general at his request, did not show who delivered the opinion.

"Where it is said that this honorable court reversed the Supreme Court 'with great complacency,' no reflection was meant upon the court, but the sentence was used more in jest than otherwise, there being some conflicting decisions between the two courts.

"A part of said article is as follows: 'On the second trial I gave the same charge and refused the same requests that I gave and refused to give on the first trial, and the Court of Appeals held that neither my charge nor refusal to charge was error, but now they hold and reverse the case in part because it was error to refuse

43

to give the request to charge that I had refused to give on the first trial. On this subject the Court of Appeals then said (second headnote): "Where the general charge to the jury embodies in substance legal principles contained in written requests to charge, any error in refusing the request to charge is harmless." Now they say as to the same request (part of first headnote), "It is error to refuse to charge the jury that if the assailant, at the time the assault was committed, intended to desist as soon as he ascertained that the woman assailed would not consent, he would not be guilty of an assault with intent to rape." On this subject I had already charged as follows: "Now, gentlemen, I charge you this: If you believe from the evidence that the defendant took hold of Mrs. Fowler, intending then and there to have carnal knowledge of her forcibly and against her will, he would be guilty of the main charge, although he may have immediately desisted therefrom from fear or otherwise. I charge you further that if you find he intentionally took hold of Mrs. Fowler, not intending to have carnal knowledge of her forcibly and against her will, but for any other reason, he would be guilty of the offense of assault and battery. But if you find from the evidence that he did not take hold of her at all, but accidentally touched her, he would not be guilty of any offense."' Then was added: 'The difference between the charge and the request is about the same as the difference between "tweedledee and tweedledum."'

"This illustration was not perhaps as dignified as it should have been, but was used with no idea of reflecting upon the court, but as being more easily comprehended by those who had previously read the former history of the case.

"The statement, 'No wonder our people are losing faith in some of our reviewing courts,' is as much a charge against the legal right (and by some courts considered a duty) to reverse on technicalities as they are presented by counsel, as it is anything else, and no reflection was meant thereby against the judicial integrity of the court.

"The use of the words 'wittingly or unwittingly' was for the purpose of preventing the necessary conclusion that the paragraph charged this honorable court with any error done wittingly.

"The last paragraph of said article is expressive of an opinion only, and does not accurately set forth the meaning intended. Re-

spondent had in mind the McCullough case only, and it is only to this case that said paragraph was intended to apply, and, as respondent contends, does not reflect upon the personal or judicial integrity of said court, or any member thereof.

"Respondent wrote said article intending it only as a fair and reasonable criticism of the decision of the court, and did not mean to reflect upon the integrity of the court, or of any member thereof, nor in any manner to impede, embarrass, or obstruct the court in the administration of justice in said case. Said article was prompted solely by the duty which respondent believed he as judge of the courts of the Cherokee circuit owed to the public, and especially the good people of Gordon county and the Cherokee circuit, and was given to the public in good faith, without malice, and without any intention whatever of impeding, embarrassing, or obstructing the due administration of justice in this court.

"Respondent did not by anything stated in said article intend to charge this court, or any member thereof, with corrupt motives, or to in any manner reflect upon the judicial integrity of this court, or any member thereof, and contends that he did not do so.

"And now, having fully answered, respondent prays the court that the rule nisi against him be dismissed."

Counsel for the respondent stated that he offered no other evidence than the answer, which was sworn to. Messrs. Adams and Cobb introduced, as evidence illustrative of the intent of the newspaper article in question, a subsequent article, published over the respondent's name in the same newspaper on October 8, 1912, which is as follows:

Editor Constitution: In my communication, published in The Constitution of the 5th instant, on the second reversal of the McCullough assault to rape case from Gordon county, by the Court of Appeals, I did not criticise the decision except for its inconsistency and misconception and misconstruction of the record; but I now want to call attention to another and more serious phase of the decision. The Court of Appeals say (Part 3d, headnote): "Ordinarily, sayings and conduct of the prisoner in his own favor several hours after he is alleged to have committed the crime are not admissible on his trial." "Based upon the social conditions and characteristics of the negro race, an inference may arise that a negro man, conscious of a guilty attempt to commit a rape upon a white woman would not quietly spend the night and a portion of the next day in a house on the farm of the husband of the woman, in close proximity to her neighbors and friends, without exhibiting some symptoms of fear or excitement. Proof that he did these things, and that he openly acted in a manner to indicate no consciousness of guilt, is admissible upon his trial for assault

with intent to rape, to be considered by the jury in connection with other facts and circumstances in the case upon the question of felonious intent."

As heretofore stated, I did allow the defendant to prove these things, except as to "some symptoms of fear or excitement," and playing with a pet squirrel up a tree in his back yard, there being no objection upon the part of the State thereto.

The first paragraph of the above quotation is the law for both the white man and the negro, but the second paragraph thereof is not the law for the white man, and should not be for the negro. It would encourage rapes upon white women by negroes by allowing them an additional defense in such cases. It is the most dangerous decision ever rendered by any court, at any time, anywhere, under any circumstances. The negro rapist is generally cunning and resourceful, and brutally courageous; and he could in almost every such case where there is no eye-witness except his victim (and there seldom is), fix up a plausible defense by going to his home on the farm of his victim or elsewhere, and remaining there and playing with his hound dog in the front yard or his pet squirrel up a tree in his back yard, and then meeting the officers with a smile and quietly asking the cause of his arrest, and then indignantly denying his guilt, knowing that he would be allowed upon the trial to prove all such things to the court and jury.

This right, say the Court of Appeals, is "based upon the social conditions and characteristics of the negro race." The people of Georgia can't afford to have one law for the white man and one for and more favorable to the negro, especially upon such trials, where the safety, honor, and virtue of our good women are involved.

The Court of Appeals may have meant well, but in their zeal for the negro, or for something else, they have lost their heads and have rendered a decision which should not stand.

The Court of Appeals should at once reconsider and recall this decision, and if they refuse to do so, the legislature should give the people a chance to abolish the court, which they would certainly do.

Yours truly, A. W. Fite.

Cartersville, Ga., October 7, 1912.

An amendment to the respondent's answer was filed, as follows:

"The second article written by respondent, and introduced in evidence by the court, published in the Atlanta Constitution October 8, 1912, was written after the court had adjourned for the term during which said decision had been rendered, and before respondent had any knowledge or intimation or believed that the rule for contempt had been or would be issued against this respondent.

"Respondent further says that in the writing and publication of said last-named article he had no intention, and hereby expressly disclaims any intention, of reflecting upon the integrity of this honorable court, or any member thereof, or in any way impede, or embarrass or disturb this honorable court in the due adminis-

tration of the law or justice. Respondent further says it was written in good faith, as a fair criticism of the decision so rendered in the McCullough case, which as a judge and a citizen he had the right to do, under the laws of the State of Georgia and the United States. This respondent distinctly disavows any intention to charge this court, or any member thereof, with any prejudice in favor of the negro race, and the criticism of respondent of the decision was based upon the record in the McCullough case, as modified and explained in the original answer this day filed.

"Respondent further says that what he said in each of said two articles is clearly within the privilege and rights guaranteed to respondent under the Bill of Rights, article 1, section 1, paragraph 15, of the constitution of the State of Georgia and as provided in article 8, amendment article 1 of the constitution of the United States. And respondent prays that the constitutional question in this amendment made, and first made in the original answer this day filed, be certified and sent up to the Supreme Court of the State of Georgia, to be there determined as the law provides."

Arguments in behalf of the respondent were made by Messrs. Milner, Maddox, Gober, and Neel; and arguments for the State were made by Messrs. Adams and Cobb. Subsequently on the day of the hearing the court adjudged the respondent guilty of contempt of court in writing and publishing the article set out in the rule, and imposed a sentence that he pay a fine of five hundred dollars (to include all costs), to be paid to the clerk of the court by October 28, 1912, or that in default thereof he be confined in the common jail of Fulton county for ten days. The fine was paid. The Chief Judge and Judge Pottle, at the time of the rendition of the judgment, delivered opinions which were afterwards revised and extended as follows. Judge Russell delivered an oral concurring opinion, but did not file a written opinion.

HILL, C. J. In the performance of the obligation exclusively imposed upon it by the constitution of the State, this court was recently called upon to review the judgment of A. W. Fite, one of the judges of the superior court, in the case of *McCullough* v. *State*, ante, 612. After a most careful consideration of the record, the court concluded that three errors of law were committed by the trial judge which were prejudicial to the accused. These errors of law were not technical in character, but related to the merits of the

case, especially the controlling issue as to the existence of a criminal intent; and, therefore, not only the law, as this court construed it, but the ends of justice, demanded another trial. Entertaining this opinion, the court reversed the judgment refusing another trial. The propositions of law upon which the reversal was based involve no novel question, and arose out of the facts of the case. Neither their soundness, justice, nor humanity can, in our opinion, be questioned by any fair, intelligent mind. The opinion of the court contained not the slightest reflection upon the ability or fairness of the trial judge. When the decision was handed down, and before reading the full text of the opinion, the respondent wrote and published in the Atlanta Constitution, a daily paper of large circulation, a most scandalous attack upon the decision of the court, even impeaching the judicial integrity of the individual Judges. Deeply regretting the necessity for action, the court felt impelled by a sense of official duty to issue the rule for contempt. Before taking this step we became convinced, by an exhaustive examination of the law, of the jurisdiction of the court to issue the rule. We did not entertain the slightest doubt as to the objectionable character of the article. Nothing that has been said by learned counsel, or by the respondent in the answer filed, has shaken our conviction on either point.

The point raised by the amended answer, that the article "is clearly within the privilege and rights guaranteed to respondent under the Bill of Rights, article 1, section 1, paragraph 15, of the constitution," accompanied by the request that we certify this constitutional law point to the Supreme Court, has been considered. The request is denied, as the question made does not involve "the construction of a provision of the constitution of this State or of the United States;" or "the constitutionality of an act of the General Assembly of this State." Personally the Judges of this court would be glad to have the Supreme Court pass upon the rule issued by this court, as well as determine the character of the newspaper article in question, but the law imposes the responsibility upon this court. It is well settled that no tribunal except the one complaining of a contempt has jurisdiction to pass upon that issue. The decision of this court as to this question is not only exclusive, but final, and this court does not shirk the duty imposed upon it, but willingly assumes full responsibility.

Three questions are presented by this record: first, whether this court has jurisdiction or power to issue the rule; second, whether the article written and published by the respondent constitutes contempt of this court; and third, the matter of punishment. The first question is one of law; the second, one of mixed law and fact; and the third, one of discretion.

The jurisdiction of this court to determine what is a criminal contempt and to punish the contemner is not an open question in this State. It is settled by the Supreme Court in the case of *Bradley* v. *State,* 111 *Ga.* 168 (36 S. E. 630, 50 L. R. A. 691, 78 Am. St. R. 157). In that case Mr. Chief Justice Simmons, speaking for the court, declares that the power to punish contempts is inherent in every court of record, and that if the court is created by the constitution, even "the legislature can not, without express constitutional authority, define what are contempts and declare that the court shall have jurisdiction over no acts except those specified." The Court of Appeals is a constitutional court, created by the people, having as to this subject the same powers and authority as are conferred upon the Supreme Court. These powers and this authority exist in the court itself as a judicial tribunal. They do not belong to the individual Judges of the court. This inherent power in courts to define contempts, especially criminal contempts, and to inflict punishment therefor, has been well settled by the courts both of this country and England. The possession of this power and its exercise in proper cases are essential to the maintenance of the respect due to the courts as representatives of the majesty of the people, entrusted by them with the high and sacred responsibility of passing upon the rights and liberties of the citizen, in the administration of law and justice. If courts fail to enforce respect, if they do not strive to preserve their independence and to maintain inviolate their judicial integrity, they will not only lose their own self-respect, but will be recreant to the duty they owe to the State. If the court is scandalized, the integrity of its Judges impeached by gross, defamatory libels of their character and their decisions, the consequences are far more hurtful than in cases of direct contempts, committed in their presence; for unfair, unjust and libelous criticisms of judicial proceedings, and unwarranted attacks reflecting upon the Judges in their judicial capacity, not only tend to endanger the rights of parties in pending cases, but

they prevent that calm and dispassionate discussion and investigation of such causes so necessary to their just and proper determination. Pernicious attacks of this character not only impede and embarrass the due administration of law and justice by the courts, but are calculated to inflame public anger, and arouse public prejudice and clamor against the Judges in the performance of their judicial functions. The power of the judiciary rests upon the faith of the people in its integrity and intelligence. Take away this faith, and the moral influence of the courts is gone and respect for the law is destroyed. Other departments of the government may outlive unjust criticism, and may still render service to the people, even when unfairly assailed, but when confidence in the courts is gone, respect for the law itself will speedily disappear, and society will become the prey of fraud, violence, and crime. The one element in government and society which the people desire above all things else to keep from the taint of suspicion is the administration of justice in the courts.

The learned counsel for the respondent, in their very fair, dignified, and able arguments, do not deny the inherent power of this court to define and punish contempts. They insist, however, that this power is limited to contempts committed in the presence of the court, or to criticisms relating to pending causes; that any criticism of a judicial decision in a case that is no longer pending, although it may be libelous and defamatory, can not be a contempt. This restricted view of the subject is supported neither by reason nor the weight of authority. Unquestionably it is a great wrong to write or publish criticisms of pending litigation, either of the judge, the jurors, the witnesses, or the parties, that tend to impede or defeat the due administration of justice, but, as has been forcibly said by a learned jurist of the Supreme Court of Virginia (Commonwealth *v.* Dandridge, 2 Va. Cases, 421), "If the power of punishment stop here, a curious consequence may ensue. A man may be attached for threatening to do that for which he could not be attached when actually done. One says of a Judge, 'If he render a certain judgment against me, I will insult or beat him.' For this he may be attached. But if (the judgment having been rendered) the insult be actually offered, an attachment no longer lies, because the contempt is in relation to the past conduct of the Judge, and to a case no longer pending. A recurrence to original

principles, the only true test, by demonstrating that the weight, authority, and independence of the court may be equally assailed either way, will prove that this distinction is merely ideal." It is said by Lord Chancellor Hardwicke, in defining the different classes of contempts, that "One kind of contempt is scandalizing the court itself." 2 Atk. 471. And in this the public is primarily interested, and the injury is just as great, whether it refers to a particular pending case, or to the court as an instrumentality of government. Other authorities hold that scandalizing a court is a criminal contempt, and the contempt need not relate to a cause still pending; that this kind of contempt arises from matters not transpiring in court, which tend to degrade or make impotent the authority of the court, or in some manner to impede or embarrass the administration of justice. State v. Shepherd, 177 Mo. 205 (76 S. W. 79, 99 Am. St. R. 624), and citations. One of the earliest common-law authorities, in his classification of contempts, includes "contempts in the face of the court," and "contemptuous words or writings concerning the court." 2 Hawkins, 220. Bouvier refers to the latter class as "extraordinary contempts," consisting of "abusive, scandalous words respecting the court." 4 Bouv. Inst. 385. According to Blackstone,—that great commentator who made of the common law a harmonious, logical, and exact science,—a contempt of the character now discussed is defined as "speaking or writing contemptuously of the court or Judges, acting in their judicial capacity." 4 Bl. Com. 285. Another authority in support of the proposition here contended for, and in line with the views entertained by the great judges and law-writers cited, is the ruling of the respondent on the exact question. In the case of the State v. Theron S. Shope, rule for contempt, Whitfield superior court, July term, 1911, Judge Fite held that an article written and published by the respondent in that case, in his newspaper, the North Georgia Citizen, was a gross contempt, richly deserving punishment by confinement in jail, although the article in question did not refer to any pending case or judicial function of the court, but was only a witty and humorous criticism of a moral lecture delivered by the judge to the public generally. This decision, while not binding upon this court as a precedent, is cited as persuasive authority, if, indeed, it is not in the nature of a judicial estoppel.

It is suggested that the proper remedy, where no case is pending and the court is scandalized, is prosecution for criminal libel. Where a publication which constitutes a contempt contains libelous attacks, a prosecution for libel can also be instituted; but the character of a publication as a criminal contempt is separate from its character as a criminal libel.   The one is punished by the court whose judicial integrity is assailed, the other may be prosecuted before a jury for a violation of the criminal statute.   It would be the grossest injustice to compel a judge to leave the bench and assume the rôle of a prosecutor to protect the court from libelous and contemptuous attacks.   Courts are not required to enforce respect through verdicts of juries, but possess the power to punish, as for criminal contempt, libelous publications upon their proceedings, present and past, upon the ground that such publications tend to degrade the tribunals, destroy public confidence and respect for their judgments, and effectually obstruct the free and impartial course of justice.   But if the courts did not have the power to protect themselves as they claim, still this court, under the facts of the present case, would have ample power to punish the respondent, even under the limitations contended for by his counsel.   The *McCullough* case was still pending in this court when the respondent wrote and published the article under consideration.   The decision of this court had, it is true, been handed down, but the term of the court during which it was rendered had not adjourned, and the remittitur had not been transmitted to the trial court; and the rule of practice is that the remittitur shall not be sent to the trial court within ten days from the filing of the decision.   During the term of its rendition, until the remittitur has been transmitted to the trial court, a judgment of this court remains under the control of the court, subject to be modified or altered, either on application for rehearing or on the court's own motion.   It is said that the case was ended because the plaintiff in error had won, and the State could not make a motion for a rehearing.   There is no reason in law why the State can not make a motion for a rehearing.   As a matter of practice, this court has entertained such motions.   But irrespective of this, the court had the right to change its judgment at any time during the term, before transmission of the remittitur to the trial court.   Indeed, the respondent, in his second article, of October 8th, in evidence, treated the decision in

the *McCullough* case as then subject to reconsideration and re-call; for in that article he declared that "the Court of Appeals should at once reconsider and recall this decision," or the people would abolish the court.

Having abundantly established the power of the court not only to define criminal contempts, but also to punish for such offenses, within the limitations prescribed by the legislature, we now come to make a concrete application of the principles announced, to the article under consideration, for the purpose of determining if the article falls within the definition of a criminal, contempt, and, if so, to fix an appropriate punishment. It is not our purpose to consider all the objectionable features of the article. No one can read the article without being convinced that it is, as a whole, a most flagrant contempt of the court, abounding in defamatory aspersions and criminal libels against the judicial integrity of the Judges. If the aspersions directly made or maliciously insinuated against the judicial conduct and official honesty of the Judges were true, they would be utterly unworthy of the great trust committed to them by the people, and would be unworthy to exercise judicial functions in passing upon the rights and liberties of the citizen. If this court does not defend and protect itself from slanderous charges of the character contained in the article, the individual Judges would deserve and should promptly receive the contempt of all intelligent and honorable men; for the court which is too weak to demand and enforce decent and respectful treatment can not expect to secure or retain the respect and confidence of the people. We will leave to the discriminating and intelligent reader to determine the character of the article as a whole, contenting ourselves with referring only to those parts specifically mentioned by the respondent in his answer.

It is asserted that the decision of this court, in reversing the lower court in the *McCullough* case, is based upon "a pitiful misconception and misconstruction of the record, which shows the utter inability of the Court of Appeals, and especially of the Judge delivering the opinion, to comprehend the record, or to render a proper decision in the case, *if they so desired.*" The assertion that there was "a pitiful misconception and misconstruction of the record," while disrespectful and contumelious, and lacking in judicial decorum, is offensive only to propriety; and the statement

that the Court of Appeals is unable "to comprehend the record, or to render a proper decision in the case," may be overlooked as the innocuous opinion of the writer as to the ability of the Judges. But the insinuation made in the last words of the sentence, that the Judges of the court did not *desire* to comprehend the record, or to render a proper decision, is a vicious attack upon the judicial integrity of the Judges composing the court, and constitutes not only a gross libel, but a most flagrant contempt. A contempt or wrong is no less a contempt or wrong because covertly suggested by insinuation or innuendo. A wound inflicted by insinuation or innuendo is usually more grievous and hurtful than one caused by a direct accusation. What greater wrong can be charged against a judge than that he does not desire to render a just or proper decision? The charge is a stab in the heart. It implies official corruption and wickedness. If made recklessly, it is inexcusable; if made deliberately, it is shameful. If true, the Judge would be infamous; if untrue, the slanderer should be infamous.

Again, in the article in question, the respondent charges that the court has reversed itself, but that this is not surprising, since the court is as apt to reverse itself as it is to reverse him, "or the Supreme Court, which they frequently do with great complacency." The objectionable part of this statement is that the court frequently reverses the Supreme Court with great complacency. The constitution of this State expressly declares that the decisions of the Supreme Court are binding upon this court; and each one of the Judges took an oath to support the constitution. The charge, therefore, is that the Judges of this court deliberately and frequently violate their oaths, and that it gives them pleasure and satisfaction to do so. No instance is given where this court ever reversed the Supreme Court; and none can be given. Indeed, every lawyer knows that such a reversal is a legal impossibility; for, if the decisions of the two courts are in conflict, the decision of the Supreme Court is controlling. It may happen that a question which has arisen in a case before the Court of Appeals and has been there decided may subsequently arise in a case in the Supreme Court, and the latter court may take a different view of the law. In such case, of course, the decision of the Supreme Court would be the law. One instance of this sort is recalled. In *Rose* v. *State*, 4 *Ga. App.* 588 (62 S. E. 117), this court held, affirming

a judgment by Judge Fite, that it was ·a violation of the law of this State to solicit, through the mail, orders for the sale of intoxicating liquors, and that the State statute was not in contravention of the clause of the Federal constitution relating to interstate commerce; following, as we thought, decisions of the Supreme Court of the United States. Subsequently Rose was convicted of a similar offense, and, the constitutional question involved having been certified by this court to the Supreme Court, that court took a different view of the question; ·holding that the statute was in contravention of the interstate-commerce clause of the Federal constitution. *R. M. Rose Co.* v. *State,* 133 *Ga.* 353 (65 S. E. 770, 36 L. R. A. (N. S.) 443). In that case this court had the satisfaction of receiving from Judge Fite, through the press, an approval of its decision, and, through the same medium, the Supreme Court was called upon to bear with equanimity the disapproval of its opinion by the same eminent legal authority. This court submitted gracefully and in silence both to the approval of its decision by Judge Fite, and its disapproval by the Supreme Court. Suppose that when the Supreme Court rendered its opinion contrary to the views of this court, the Judges of this court had at once rushed into the newspapers, and charged the highest court in the State with "a pitiful misconception and misconstruction of the record," with a desire not to render a proper decision, and that it had failed to give its "real reason" for differing from this court, and from the Supreme Court of the United States and Judge Fite; that "the truth" was that the Supreme Court did not want the prohibition law enforced, but favored the sale of liquor in the State, and wanted to give the whisky dealers license to send into the State circulars soliciting orders for the sale of intoxicating liquors, and thus make of no effect the law of this State; would not every intelligent and law-abiding citizen of Georgia have denounced this action of the Judges of the Court of Appeals as a most flagrant contempt and gross libel upon the judicial integrity of the Judges of the Supreme Court? Could there have been found in all the broad limits of Georgia an apologist for such an inexcusable attack on the dignity and probity of the Supreme Court? And yet this would not have been as aggravated an offense as Judge Fite's attack upon the decision of this court in the *McCullough* case; for he charged all this, adding to this great wrong the unspeakable

calumny that the members of this court suppressed their "real reason" because they "don't believe that a negro should be punished twenty years in the penitentiary for an assault to rape on the wife of a humble farmer."

The respondent says, in his answer, that he was jesting when he charged that this court frequently reversed, with great complacency, the Supreme Court. On the assumption that the respondent knew the relative jurisdiction of the two courts, the statement can only be construed as a direct, intentional charge that the Judges of this court found pleasant satisfaction in the violation of their official oaths by frequently reversing the Supreme Court; and it is certainly too great a tax on the credulity of this court to accept as a jest any portion of this most scurrilous article.

In the conclusion of his unwarranted attack, the respondent uses the following language, referring to the reversals in the *McCullough* case: "The real reason for the reversals has never been given. The truth is that the Court of Appeals don't believe that a negro should be punished twenty years in the penitentiary for an assault to rape on the wife of a humble farmer, but I put them on notice that I do not agree with them." It would be impossible to express in language a more vicious and flagrant contempt of the Judges of this court in their judicial capacity, and also a grosser and more defamatory libel against the Judges as individuals. He charges the court with judicial deception in suppressing the "real reason" for the decisions, and in giving false reasons. No greater reflection could be made against a Judge than the charge that he suppresses the truth and perverts the facts in his opinions; that he prostitutes his high trust to promoting the cause of falsehood and injustice, instead of truth and justice; and that in this case this great judicial crime was committed by the Judges of this court because they "don't believe that a negro should be punished twenty years in the penitentiary for an assault to rape on the wife of a humble farmer." We ask every honest, fair-minded man in Georgia to consider the outrage and insult to southern character and manhood expressed and implied by this language. Did the respondent expect any man of character and intelligence to believe the charge? Did he believe it himself? Did he believe that three men honored by the people with seats on this high tribunal, southern men, decendants of southern men and women, true in

every fiber of their being and every pulsation of their hearts to the land of their birth and the memory of their ancestors, should be so low and degraded as judges as to be willing to commit judicial perjury because as individuals they "don't believe that a negro should be punished twenty years in the penitentiary for an assault to rape on the wife of a humble farmer?" What wicked and vicious purpose inspired the deliberate writing and publishing of so false and foul a slander of men who, as individuals, had always entertained friendly sentiments for the respondent, and who as Judges have never intentionally made any unkind criticism of his judicial conduct? In his answer the respondent states that this offensive statement was meant as an expression of his opinion, and was intended as applicable alone to the *McCullough* case. This explanation, if true, does not extract the poison. But the meaning intended must be judged by the language used. The language deliberately used does not bear the construction that it was simply an opinion and only applicable to the particular case. "The *real reason* for the reversals has never been given. The *truth* is [not "my opinion is"] that the Court of Appeals don't believe that *a* negro [not merely this negro, but any negro] should be punished twenty years in the penitentiary for an assault *to* rape on the wife of a humble farmer." The utter insincerity of the attempted explanation of his language is emphasized by the fact that this court had overruled the defendant's exception to the sentence, and declined to hold that it was excessive.

It is perfectly manifest that the respondent had two purposes in making the statement,—to inflame race passion, and to excite the prejudice of one class against the Judges of this court. Both purposes are vicious and shameful to the last degree, and deserve the indignant condemnation of every true man, especially when such appeals are made for such wicked purposes by one holding a high judicial office. There is nothing in the facts of the *McCullough* case to justify or palliate the tirade of abuse and contempt written and published against the court by the respondent. The most inexcusable feature of the respondent's conduct is his efforts to arouse race passion and prejudice against the court by endeavoring to mislead the public into thinking that the case was one of a brutal, violent, outrageous assault to rape by a negro on a white woman.

The vivid imagination of counsel gives lurid pictures of the respondent holding back an outraged populace to keep them from wreaking upon the negro speedy and lawless vengeance. The picture is slightly overdrawn, and does rank injustice to the good people of Gordon county. Instead of there being a lawless mob at the trial, the record discloses that many of the good white citizens of Gordon county, men and women, came as witnesses and bore testimony to the negro's exceptional good character from his youth, and that, instead of being eager to punish, a jury of twelve men were most reluctant to find him guilty, hesitating for fifteen hours before doing so. Is it conceivable that the jury would have hesitated so long, but for a grave doubt of the guilt of the accused? Would the jury have been out a longer time than was necessary to write the verdict, if there had not been on their minds serious doubt of any felonious intent? Indeed, there is much in the evidence to justify doubt of the negro's guilt. The evidence of the good woman herself, most strongly weighed against the negro, leaves in grave doubt his felonious intent. According to her testimony, he was shucking corn near where she was milking, and there were several kittens near by, in the crib, behind a plank partition three or four feet high, and she went to the kittens to give them some milk. She testified: "I asked Jerry [the defendant] if he had seen what a fine lot of kittens we had, while I was milking. . . At that time he had not seen them. . . I came out from where I was milking and went into the place where the kittens were. . . While I was stooping over to pour the milk the defendant came in. . . When I stooped over the defendant came in and put both of his hands on me, one on my shoulder and one on my side; I told him then to get out of there or I would knock him out; he said, 'I ain't going to hurt you.' When I told him to stop, he kind of stepped back and didn't try to do anything after that." If his brutal passions had been aroused and he intended a felonious assault, why did he not take hold of her with violence? Why did he not continue the assault? Why did he immediately desist on show of indignation? He had no reason to expect that she would not be indignant. If he had the intent charged, there was nothing to prevent him from at least making an effort to accomplish his purpose, except a weak and defenseless woman. This was not the conduct of a brute inflamed by lust, with his intended

and helpless victim at his mercy. She ordered him to leave the place, and told him she intended to tell her husband of his conduct. Notwithstanding the order and the threat, he went to his home on the premises, near the house in which she and her husband resided, remained there all night, and was found in the yard next morning by the arresting officer, quietly playing with a pet squirrel. Did this conduct show consciousness of guilt? Did it not tend to corroborate his statement that he meant no harm, but that, in passing her to look at the kittens, after she had asked him if he had seen them, he accidentally brushed against her arm, and at once disclaimed any improper purpose? Is it conceivable that a negro who has committed a felonious assault upon a white man's wife, and who knows that the husband will be told of it, with the certainty that the outraged husband will speedily, and probably to the extent of killing, avenge the wrong, will nevertheless go to his home near by, on the husband's premises, and remain there all night, and the next morning be found quietly playing in the back-yard? Would not the criminal flee from just, certain, and speedy punishment? Was not a consciousness of innocence strongly shown by the conduct of this negro? And while the woman was naturally and justly indignant at what she thought was an assault, yet her conduct immediately thereafter shows that she herself did not believe the negro intended a felonious assault. She did not seek safety in immediate flight to the house of a near-by neighbor. Alone on the lot with the negro and two small children, she remained there for a while. She talked to a white girl acquaintance immediately after the occurrence, exhibiting not the slightest excitement or nervousness, and, when she finally went to visit a neighbor, a friend of her own sex, she not only showed no indication of excitement or nervousness, but did not, in a conversation of two hours, even mention the incident. Nor was the conduct of the husband when told of the incident such as to indicate that he believed that his wife was the victim of a criminal assault. He did not seek out the negro that night, but gave him every opportunity to escape, and, the next morning, did not go with the arresting party, but, when the negro was in custody, went to his cabin and took possession of his "pig and heifer." It is perfectly evident from the conduct of the husband that his wife's statement did not convince him of an intent to commit a felonious assault. Indeed,

44

there was some evidence that the husband stated to a neighbor that in his opinion no such assault was intended.

Now let it be understood that in what is here said there is not the slightest purpose to discredit the evidence of the good woman in this case. It is only for the purpose of showing that, admitting the truth of everything she stated, viewed in the light of her own subsequent conduct and that of her husband, and especially that of the negro, and the reluctance of the jury to convict, there seems grave doubt of the guilt of the accused of any offense greater than assault and battery, which may be committed by the placing of hands, however lightly, upon a woman without her consent.

Taking advantage of the character of the charge, and the sensitive feeling of our people on the subject (with which the members of this court are in most thorough sympathy and accord), and withholding the facts of the case, the respondent endeavors most unjustly, in the newspaper article in question, to excite race prejudice and indignation against this court. This vicious purpose of the original article is further manifested by the published article of October 8th, in which the respondent says: "The Court of Appeals . . *in their zeal for the negro, or for something else,* . . have rendered a decision which should not stand." We leave this statement, without comment, to the judgment of all honorable and high-minded men.

I yield to no man in my loyalty to the blood and traditions of my own race, but, in the performance of my high and solemn duties as a judge, I recognize but one master—the law, and I hear but one voice—justice; and no sentiment, however sacred, can lead me, as a judge, to deprive any man, whatever his color or condition, or however humble his position, of the equal protection of the law and of that justice to which I think he is entitled. The oath I took when I assumed the great trust of this high office,— "I will administer justice without respect to person, and do equal rights to the poor and the rich,"—was to me no meaningless formality. I consecrated myself to a sacred observance of that solemn obligation. And in the conscientious performance of the high trust, adopting the language of a great English judge, "The lies of calumny carry no terror to me. I will not avoid doing what I think is right, though it should draw on me the whole artillery of libels—all that falsehood and malice can invent, or the credulity of a deluded populace can swallow."

If the facts of the *McCullough* case did not justify the respondent in his tirade of abuse and unjust accusation, neither is justification or excuse therefor to be found in either one of the decisions reversing the judgments of the trial judge in that case. In neither decision was there the slightest intentionally unkind reflection upon him. The first reversal was based upon the express rulings of the Supreme Court in many cases, that the right to poll a jury was a legal right to be exercised before passing sentence, and that a deprivation of this right demanded the grant of another trial. *Robinson* v. *State,* 109 *Ga.* 506 (34 S. E. 1017). And it was not denied that the trial judge, in passing sentence immediately after the verdict was read, deprived the accused of this legal right. This court was compelled, therefore, by its oath, to enforce these decisions of the Supreme Court. If the evidence had demanded the verdict, we would have regarded this error of law as harmless; but in view of the serious doubt as to the felonious intent shown, not only by the evidence, but by the long hesitation of the jury to convict, the ends of justice required that every legal right should be given the accused. For this decision, containing not one intentionally unkind or disrespectful word, this court was taken to task by the respondent in a most unjust and unfair article, published in the Atlanta Constitution, even before the opinion of the court was read by him. This article, while plainly contemptuous and grossly libelous, the court passed by without notice.

The second reversal, which was the provocation for the article now under consideration, was based upon three errors of law, which, in view of the doubtful character of the evidence, and the great reluctance of the jury to convict, in our opinion entitled the accused to another trial. These three questions are stated in the headnotes prepared by Judge Pottle for the court. One of these is as follows: "On account of difference in race, and social customs founded thereon, juries are permitted to infer that a negro man who assaulted a white woman did not expect her to yield to his embraces without the use of force sufficient to overpower her will. Based upon the same social conditions and the characteristics of the negro race, an inference may also arise that a negro man, consciously guilty of an attempt to commit a rape upon a white woman, would not quietly spend a night and a portion of the next day in a house on the farm of the husband of the woman, in close

proximity to his neighbors and friends, without exhibiting some symptoms of fear or excitement. Proof that he did these things, and that he openly acted in a manner to indicate no consciousness of guilt, is admissible upon his trial for assault with intent to rape, to be considered by the jury, in connection with other facts and circumstances in the case upon the question of felonious intent." In the light of the evidence heretofore given, can there be any doubt of the justness or soundness of this ruling? Another ground for the reversal is indicated by the following headnote: "The motives which lie at the foundation of a criminal prosecution may always be inquired into for the purpose of illustrating the bona fides of the prosecution. Sayings of the prosecutor which, if true, indicate that the prosecution is instituted in bad faith, and which also affect the credibility of his testimony, are admissible in evidence." Can either lawyer or layman question the soundness of this ruling? Further: This court held that the inference of felonious intent, which it is held, in view of the difference in race between the parties, and social customs founded thereon, may arise where a negro man assaults a white woman (and as to which the court below charged the jury), is not conclusive; and that the court below erred in refusing to give instructions to the jury to the effect that (even if the accused at first acted with lustful motive), if he intended to desist as soon as he found that the woman would not consent, he would not be guilty of assault with intent to rape; and that one of the essential elements of assault with intent to rape is "a purpose to carry into effect the intent with force and against the consent of the female." The instructions requested were especially pertinent in view of the testimony of the woman herself that the negro immediately desisted and disclaimed any criminal intent, when she showed indignation and resentment, and of the subsequent conduct of the negro tending to show the absence of felonious intent, and corroborative of his statement that the occurrence was accidental. In ruling as we did as to the refusal of the court below to charge the jury as requested, this court followed rulings of the Supreme Court, which are cited in the opinion.

These three rulings furnish all the apparent provocation for the outrageous and deliberate attack made by the respondent upon this court, and upon which he bases his demand that the decision

be at once recalled, under threat that otherwise the court will be abolished. We have gone into that decision only for the purpose of showing the absolutely inexcusable conduct of the respondent. Every intelligent man must know that whether the *McCullough* case was rightly or wrongly decided by this court is wholly irrelevant and immaterial. It is the law of the case, and the trial judge is obliged to recognize and follow it; if he does not, he disregards the obligations of his oath. Consider for a moment how intolerable would be the position of the Judges of the appellate courts if, for every reversal, they should be subjected to unjust and libelous criticisms in the public press by the judges of the lower courts whose decisions were reversed. If such criticisms were held in terrorem over the heads of appellate Judges, it would be impossible for them to exercise that calm, impartial, impersonal judgment so necessary to the just and proper decision of cases. And if this procedure were tolerated, the people would soon lose all respect for the judgments of the higher courts and for the judiciary. Fortunately, public criticism by a trial judge of decisions reversing his judgments has, as a rule, been regarded by judges as not only repugnant to every sentiment of judicial comity, but improper from every standpoint. The judges have the right to differ from the legal conclusions of the reviewing courts, and to express in appropriate language adverse views, but a sense of propriety, and respect for the judicial office, prevent the exercise of the right in an offensive manner. The respondent has the unique distinction of being the only trial judge in Georgia who has ever resorted to libelous and contemptuous publications against the appellate courts for the exercise by them in a respectful manner of their duty under the constitution. He will probably never have any judge to contest with him the exceptional rôle of apparently taking pleasure in resorting to the newspapers for the purpose of tearing down the reputation and character of his judicial brethren.

The respondent, in his answer, claims that in the publication of the article he was within the privilege of freedom of speech and of the press guaranteed by the constitution of the State. This great privilege of freedom was never intended as a refuge for the contemner, the slanderer, and the libeler. "Any person may speak, write, and publish his sentiments on all subjects, *being responsible* for the abuse of that liberty." Bill of Rights (Civil Code, § 6371).

But in all republican governments character, both private and public, has always been regarded as the most valuable asset of the man and of the official; and everywhere in civilized communities contempt of court and slander and libel of individuals or of public servants have been regarded as an *abuse* of the freedom of the press or of speech. The press can be free, and men can freely speak and write, without indulgence in libel or slander. The utmost latitude should be allowed for fair, full, and free review by the press and individuals of decisions of the courts. Just criticism may assail the opinions, expose the fallacies, and warn of the errors. The opinions of courts are not solemn edicts to be blindly assented to, but are subject to calm and fearless strictures, and all right-minded Judges invite, indeed welcome, such criticisms. The article by the respondent is not of this character of criticism. It is scandalous in tone and spirit. It falsely impugns the integrity of the Judges of this court. It is wilfully designed to excite prejudice and passion against the court. It charges directly and by base insinuation criminal judicial action. It is, in short, a most flagrant contempt, without one circumstance to palliate its enormity or to save it from the condemnation of all honorable, fair-minded men. If what is said and implied in the article were true, the Judges of this court should be stripped of the judicial ermine in which they have been clothed by the confidence of the people. If what has been written and published is not true, possessing not even a semblance of truth, the writer and publisher should be stripped by an indignant people of the judicial robe which he has dragged through the mire of personal venom, injustice, and slander. It is not a question of the abolition of courts, but a question of the abolition of judges. We put the issue squarely up to the great body of the people who have established these institutions of law and justice, clothed them with dignity and power, elected men to serve them as their judicial agents, and who will never fail, in the long run, to distinguish between right and wrong, between the true and the false, between the faithful and the faithless servant, and who have no patience with injustice and slander, or with those who find delight in doing injustice and inflicting wrong.

If this opinion is long, our excuse is the vital importance of the subject to the administration of justice in the State, and the priceless possession of judicial honor and integrity. If the writer some-

times uses language unbefitting the calmness and dignity of judicial expression, he begs the utmost indulgence and charity of the people. In becoming a judge he did not cease to be a man; and in defending the honor of the judge, so inexcusably and unjustly assailed, he could not at all times fully restrain the indignation of the man.

What ought the punishment to be? The disclaimer attempted by the answer presents no circumstance of mitigation. There is no apology for the wrong, and no retraction of the offense. Learned counsel for the respondent say that the disclaimer of intended reflection on the court is not traversed, and should therefore be accepted. Every word in this published article is a complete traverse of the truth of the respondent's disclaimer,—that he did not intend "to in any manner reflect upon the judicial integrity of this court." We are admonished by distinguished counsel that we should be conservative; that it is a very serious matter to cite a judge before a court and punish him for contempt, and that the present is the only occasion where such a proceeding has ever been instituted. This is to the credit and honor of the judiciary, and we sincerely trust that it will remain as the only instance in this State where a judge has so far forgotten the proprieties of his office, and that justice and fair treatment due to his brethren of the bench. This offensive article is not the temporary ebullition of a lawyer who has lost his cause. It is not the sensational report of a judicial proceeding made by a newspaper reporter which, without malice, is intended to attract the attention of the public. It is not the thoughtless expression of the citizen in ignorance of the law or the facts. It is the deliberate preparation, writing, and publication of a most scandalous article by a judge, thoroughly cognizant of the respect due to courts, as manifested in his own repeated acts when the dignity of his own court, as he thought, was involved. These facts greatly aggravate his offense. Our power to punish is limited by the statute. We have great respect for the office which the respondent occupies, and for the people who have so highly honored him for years. For these reasons, while we think his offense is so flagrant and so inexcusable that a jail sentence would be richly deserved, we will content ourselves with imposing a fine.

In conclusion, the Judges of this court recognize that the friction

between them and the respondent as judge of the superior court is to be profoundly regretted. This condition is not justly chargeable to anything done by this court. The court simply exercised in an orderly, respectful, and kindly manner its solemn duty under the constitution. For this it has been bitterly and unjustly assailed, its motives impugned, and persistent efforts made to bring its judgments into contempt. There is no possible excuse for this condition. This court has, under great provocation, submitted in silence, and acts now only because impelled to do so from a high sense of official duty. The writer has the highest regard and respect for the trial judges of Georgia. He has never approached the consideration of a record in a case brought up for review without the profoundest distrust of his own learning and ability; and, without the assistance of erudite and conscientious attorneys for the litigants, and conferences with his associates, he would be unwilling to rely upon the conclusions of his own judgment. And those who know him will not doubt the utmost sincerity of his deep personal regret at the unseemly controversy so unjustly forced upon the court of which he is a member. In my official relations with my colaborers in the cause of law and justice I have ever striven to follow the light of the Golden Rule: "Do unto others as ye would that others should do unto you." I trust that I may be pardoned for commending to the respondent, my brother judge, the practice of this gentle and charitable precept. "In so doing, life will be sweeter, the world will be better, and the faults of our neighbors (including those of our brother judges) will not appear so unpardonable."

POTTLE, J., concurring. The issues presented by the rule and answer in this case are of the utmost moment—indeed they are of graver importance than any other questions with which this court has been called upon to deal. Had we consulted our personal feelings, we would infinitely have preferred to take no official notice of the article written by the respondent, and let his conduct receive that censure which it merits from an enlightened public opinion. Many times have courts been forced into a trying situation such as that which now confronts this court. In a similar case in Virginia many years ago Judge Dade thus gave expression to his own feelings upon the subject: "If the Judges, in the discharge of their official duties, could permit themselves to be in-

fluenced by personal considerations, they might deplore the occurrence of this case. They can not but feel it a delicate and invidious task to define and decide upon the extent of their own powers, nor be ignorant that the judgment they are called upon to render may expose them on the one hand to the imputation of timidity and irresolution, or on the other to that of usurpation and tyranny. The verity of these suspicions would not be more unworthy of the Judges than the fact of their shrinking from this question because of the consequences in which themselves might be involved by it. Every occasion of resort to their extraordinary powers should, without doubt, be carefully avoided by them; but when forced upon them, should be met in the front with deliberation and firmness. And although the issue of the contest might be to prove them naked, powerless, and defenceless, they would yet prefer this to a flimsy panoply of deception, which would be a defense against the weak only until the strong should please to tear it from their shoulders. With such sentiments they have entered upon the consideration of this case, conscious that they have less at stake than the public, and regardless of consequences, which could not have been averted without a dereliction of duty." Com. v. Danbridge, 2 Va. Cas. 414. Speaking along the same line Lord Chancellor Cottenham said in Charlton's case: "If I consulted my own personal feelings upon the subject, I should pass by these [letters] as a foolish attempt at undue influence; but if I were to adopt that course, I should consider myself guilty of a very great dereliction of my high duty." 14 Eng. Ch. R. 343. Every high-minded judge must share the sentiments expressed by these two jurists. Indeed, I may say for my associates as well as for myself that this rule would never have been issued except from an impelling sense of public duty. Our duty in this case lies midway between judicial tyranny and judicial timidity. If the duty is plain the consequences of its exercise are of comparatively little moment.

We can not be deterred by the suggestion that we are judges in our own case, for we are but following precedents handed down from the earliest times, that only the court whose dignity is offended has jurisdiction to punish the offender. Moreover, this is not our case. It is the case of the people, whose servants and representatives we are. It may be granted that the judge can not

be completely separated from that intangible thing called the court, but when the motives and conduct of the judge are impugned, the integrity of the court is assailed, the administration of the law is embarrassed, and the law itself brought into disrepute. The people have a right to demand of the individual citizen not only obedience to the law, but proper respect and regard for the authorities appointed by them to administer the law. When they either directly or through their representatives commission their judges, they in effect say to the individual members of society, "These servants of ours must be obeyed and respected as such so long' as they are in commission, and we confer upon them full power and authority to compel that obedience and respect to which they are, as our representatives, entitled." No one contends that judges are beyond fair and respectful criticism for either personal or official conduct. No ·such contention would be admissible in a free government; and, indeed, such criticism is necessary to the maintenance of an upright and unsullied judiciary. This court was created by the sovereign people for the public weal. It is incompatible with the public interests, and inconceivable that the people could have intended, that one member of society should be permitted, by spoken or written language, or by overt acts, to impair the efficiency of· the court or destroy' the usefulness of this agency of the people, created to aid in the preservation of law and order. The people were careful to insure the independence of the judiciary by providing that this department of the government should remain separate and distinct from the legislative and executive. And, as if to emphasize the important position of the judiciary, it was expressly provided in our constitution that legislative acts in contravention of the constitution should be declared void by this department of the government. Civil Code (1910), § 6392. As a further safeguard to the independence of the judiciary, no judicial officer can be held civilly liable for his official acts, even when in excess of his jurisdiction. *Calhoun* v. *Little,* 106 *Ga.* 336 (32 S. E. 86, 43 L. R. A. 630, 71 Am. St. R. 254). The people, therefore, are vitally interested in the preservation of the integrity of their courts and the maintenance of that respect for constituted authority so essential to the perpetuation of our system of government. The effect on the individual temporarily holding judicial office is of small concern. An insult to him which is not likewise an

affront to the people whom he for the time-being represents may be passed unnoticed; but when corrupt motives are ascribed to him as the basis for his official conduct, and he is charged with violating his oath of office and with having intentionally, for base and unworthy reasons, rendered an incorrect judgment in a case pending before him, then it is well enough to inquire whether he ought not, in his official capacity as the representative of the people, to call the wrong-doer to account and punish him for the indignity offered, not to the individual as such, but to the tribunal commissioned by the people to administer the law in their behalf. These observations lead me to inquire: (1) Did this court have jurisdiction to issue the rule? (2) Is the article written by the respondent a contempt of this court? (3) If so, is the showing made sufficient to purge the respondent of the contempt?

1. There is perhaps no principle better settled than that all courts, at least those of superior jurisdiction, have the inherent power to punish for contempt, even in the absence of any authority so to do from the legislative department of the government. A mere casual inspection of the digests and text-books will show the unanimity with which this proposition has been announced from the earliest times. If the court be statutory, that is, having only legislative sanction for its existence, its power to define and punish contempts may be limited by statute. If, however, the court be created in the constitution by the direct sanction of the whole people, its power in this respect can be limited only by its creator. Upon this branch of the case, therefore, I need only inquire whether any limitation has been placed by the constitution upon the power of this court to define and punish contempts. That instrument declares that "the power of the courts to punish for contempts shall be limited by legislative acts." Civil Code (1910), § 6376. The General Assembly has declared that the power of the several courts in this State to inflict summary punishment for contempt shall not extend to any cases except "the misbehavior of any person or persons in the presence of said courts or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said court in their official transactions, and the disobedience or resistance by any officer of said courts, party, juror, witness, or other person or persons to any lawful writ, process, order, rule, decree, or command of the said courts." Civil Code

(1910), § 4643. If this section of the code is binding upon this court as a proper execution of the constitutional mandate, then the respondent is not in contempt and can not be punished. Indeed under a literal interpretation of this section one might threaten or even assault a judge off the bench to compel the rendition of a particular decision in a pending cause—he might publicly abuse and insult a magistrate to coerce a decision, or in revenge for one already rendered, and yet not be in contempt, provided only that the wrongful conduct be not in court or so near thereto as to obstruct the administration of justice. If this were true, deplorable indeed would be the condition of our courts, and no fearless and impartial man could afford to seek or hold judicial office. Fortunately for the public and for the orderly administration of law and justice, the Supreme Court of this State has expressly declared that the constitutional provision above quoted conferred authority upon the General Assembly to limit the punishment for contempt which a court created by the constitution might impose, but did not grant the right to take away from such a court the inherent power to define contempts and punish therefor, within the statutory limitations. *Bradley* v. *State,* 111 *Ga.* 168 (36 S. E. 630, 50 L. R. A. 691, 78 Am. St. R. 157). This decision was by a full bench of six Justices, and was rendered more than twelve years ago. There having been no effort to amend the constitution since this decision, it may be assumed that the people are satisfied with the construction placed upon the constitution by the Supreme Court, and that they are willing for the courts to use the power inherent in them under the common law, for the purpose of maintaining their independence and insuring the fearless and impartial administration of the law.

2. In determining what is the inherent power of this court in the matter of contempts, resort must be had to the common and statute law of England at the time of our adopting statute, for we are bound by that law as it then existed, unless it be unsuited to our conditions or has been changed by our constitution, or some valid statute passed in pursuance thereof. As has been seen, there is no such statute. In *Mitchum* v. *State,* 11 *Ga.* 615, 631, Judge Nisbet, one of the purest judges who ever sat on any bench, used this language: "All courts have power to protect themselves from contempts, and indecency in words or sentiments is a contempt.

This is a matter of course in the courts of civilized communities. Nor is it a matter of form merely; for no court can command from a civilized public that respect which is necessary to an efficient administration of the law, without maintaining in the business of the court that courtesy, and dignity, and purity which characterize the intercourse of gentlemen in private life." The following appears in Oswald on Contempt of Court, p. 9: "A Court of Justice without power to vindicate its own dignity, to enforce obedience to its mandates, to protect its officers, or to shield those who are entrusted to its care, would be an anomaly which could not be permitted to exist in any civilized community. Without such protection Courts of Justice would soon lose their hold upon the public respect, and the maintenance of law and order would be rendered impossible." Blackstone declared that contempts were of two kinds,—direct, those which openly insult or resist the powers of the courts or the persons of the judges presiding there; or consequential, those which "plainly tend to create an universal disregard of their authority." Among the latter class of contempts he mentions "speaking or writing contemptuously of the court or judges, acting in their judicial capacity; by printing false accounts (or even true ones without proper permission) of causes then depending in judgment; and by anything in short that demonstrates a gross want of that regard and respect which when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom) is entirely lost among the people." 4 Bl. Com. 284, 285. "A criminal contempt embraces all acts committed against the majesty of the law, and the primary purpose of their punishment is the vindication of public authority." 7 Am. & Eng. Enc. Law (2d ed.), 28. "A constructive contempt is an act done not in the presence of the court, but at a distance, which tends to belittle, to degrade, or to obstruct, interrupt, prevent, or embarrass the administration of justice." 9 Cyc. 6. "To charge a judge with injustice is a grievous contempt. To accuse him of corruption might be a worse insult; but a charge of injustice is as gross an insult as can be imagined short of that. The arraignment of the justice of the judges is the arraigning the King's justice; it is an impeachment of his wisdom and goodness in the choice of his judges and excites in the minds of his people a general dissatisfaction with all judicial determinations and in-

disposes their minds to obey them." Oswald, Contempt of Court, 49. In a leading case, often cited and referred to,—that of the printer of the St. James Evening Post, 2 Atk. 469,—Lord Chancellor Hardwicke stated that "one kind of contempt is scandalizing the court itself." A constructive contempt has been defined to be some act done, "not in the presence of the court or judge, that tends to obstruct the administration of justice, or bring the court or judge or the administration of justice into disrespect." In re Dill, 32 Kan. 668 (49 Am. R. 505). Criminal contempts consist in "acts disrespectful to the court or its process, or obstructing the administration of justice, or tending to bring the court into disrepute." Wyatt *v.* People, 17 Colo. 252 (7), (28 Pac. 961). "The right to punish for contempts extends not only to acts which directly and openly insult the powers of the court or the persons of the judges, but to indirect and constructive contempts which obstruct the process and degrade the authority of the court." Watson *v.* Williams, 36 Miss. 331. These definitions serve to illustrate in a general way what has been regarded as an indirect or constructive criminal contempt,—that is, conduct or language which tends to scandalize the court itself and bring it into disrepute. The definitions proceed upon the idea that courts are the agents of the people, and that contempts against the courts in the administration of the laws are insults offered to the authority of the people themselves, and not to the agents of the law whom they employ in the conduct of this branch of governmental affairs. When this is understood, no good citizen will make the mistake of assuming that in punishing for contempt the judge is acting from private motives, to gratify personal revenge. We will proceed next to inquire how these general definitions have been applied, and then see whether or not the respondent is in contempt.

All the authorities are agreed that it is contempt for one to use language or be guilty of conduct which has for its purpose the improper influencing of a court in reference to a decision in a pending proceeding. A publishing company was held in contempt for promulgating an article threatening the judges with public odium and reprobation if they did not decide a pending case a certain way. State *v.* Bee Pub. Co., 60 Neb. 282 (83 N. W. 204, 50 L. R. A. 195, 83 Am. St. R. 531). In West Virginia it was held that a publication in a newspaper with reference to a case pending in the

Supreme Court of that State, which charged three of the four judges with attending a political caucus more than a year before and advising action out of which the case arose, and promising to hold the action legal and proper, and charged the court with agreeing to decide the case before an approaching political convention for political purposes, was a contempt of court which might be summarily punished. State v. Frew, 24 W. Va. 416 (49 Am. R. 257). In Massachusetts it was held that the publication of a newspaper article pending a trial and concerning the pending cause, which was calculated to prejudice the jury and prevent a fair trial, was a criminal contempt, and that the publishing company might be summarily punished. Telegram Newspaper Co. v. Commonwealth, 172 Mass. 294 (52 N. E. 445, 44 L. R. A. 159, 70 Am. St. R. 280). In re Pryor, 18 Kan. 72 (26 Am. R. 747), an attorney addressed to the presiding judge a communication in reference to a cause pending upon a motion to dissolve an injunction, in which connection this language was used: "The ruling you have made is directly contrary to every principle of law, and everybody knows it, I believe," and it is "my desire that no such decision shall stand unreversed in any court I practice in." The attorney was adjudged in contempt and the judgment was affirmed by the Supreme Court.

It is insisted by counsel for the respondent that the power to punish for a constructive or indirect contempt is limited to cases such as those just referred to,—that is, conduct or language tending to reflect upon the court or influence its action in reference to a pending proceeding. Undoubtedly there are cases which either seemingly or actually support counsel's view, some of which they cite in their briefs. But all of us are of the opinion that this contention is supported neither upon principle nor by the weight of authority. Let us examine some of the decided cases. In Commonwealth v. Dandridge, 2 Va. Cas. 408, a person who was interested in a pending cause met the judge as he was proceeding up the steps of the court-house to take his seat on the bench, and used insulting language toward him. Counsel for the respondent in a rule for contempt sought to draw the same distinction which counsel now seek to make, which can not better be answered than to quote the following language of Judge Dade in that case: "It is said, that the attaching power may be exercised for contempts touching the prospective conduct of the Judge, but not for such as

touch his past conduct. In reason, I see but one pretence for this distinction: threats and menaces of insult or injury to a Judge, in case he shall render a certain judgment, may be considered as impairing his independence and impartiality in the particular case to which the threats refer. And if the power of punishment stop here, a curious consequence may ensue. A man may be attached for threatening to do that for which he could not be attached, when actually done. One says of a Judge, 'If he render a certain judgment against me, I will insult or beat him.' For this, he may be attached. But, if (the judgment having been rendered) the insult be actually offered, an attachment no longer lies; because the contempt is in relation to the past conduct of the Judge, and to a case no longer pending. A recurrence to original principles, the only true test, by demonstrating that the weight, authority, and independence of the court may be equally assailed either way, will prove that this distinction is merely ideal." Perhaps no finer language on the subject can be found in the books than that of Judge Jones in McLeod's case, 120 Fed. 130. He says: "Why are officers protected, if not to safeguard the administration of justice? There is generally no reason for protecting an officer as to the discharge of duty, which does not apply with equal force as well after it is done as while it is being performed. What a man fears may happen to him in the future because of doing his duty, if contemplated at the time the duty is being considered, may, and generally does, influence the discharge of that duty. The desire for vengeance frequently arises only after the duty is performed, because of its performance, creating greater need for protection to the officer than while he is executing the duty. In Divine and human laws the effective means relied on to restrain the acts of men is to hold up before their eyes the consequences which may result from their acts. Will the ordinary officer discharge his duty, fearlessly and unawed, against the powerful, the vicious, and the desperate, when he knows that, the moment the duty is done, the power he serves will withdraw its protection, and leave him naked to the vengeance his act arouses? Will the lawbreaker dread to give loose rein to his passion, when he feels that the court can not or will not punish assaults upon its officers because of past discharge of duty? . . Greater still must be the sweep of the evil, if judicial officers can with impunity be subjected, without resort to any court, to re-

sponsibility for judicial acts, and punished therefor by private vengeance, administered by persons who in the past have come in harsh contact with their power. Who would have any respect for the authority of a court whose judge, the moment he left the court-house, could be subjected, with impunity, to insult and assault because of acts done in his judicial capacity while on the bench? Is it in the power of any person, by insulting or assaulting the judge because of official acts, if only the assailant restrains his passion until the judge leaves the court building, to compel the judge to forfeit either his own self-respect and the regard of the people by tame submission to the indignity, or else set in his own person the evil example of punishing the insult by taking the law into his own hands? If he forbear for the time, and resort to the criminal law, the remedy is hardly better than the wrong, since then he must become a private prosecutor in some other court, and depend on it to·vindicate the independence of his own court. Un-less the court, whose officer he is, can and will punish such conduct and acts towards the person of the judge, when past discharge of duty is the motive for the indignity, the judge must submit to some of these alternatives; and any of them degrade his office and bring the administration of justice into scandal. No high-minded, manly man would hold judicial office under such conditions. Jus-tice would depend not alone on the learning and integrity of the judge. His ability and will to fight unto death, even in a street brawl, would be equally, if not more, important. Are not these things of grave concern to the court, which can exercise its func-tions of administering justice only through the judge who is thus badgered, assaulted, and intimidated because of judicial acts? When the duty and power of the court to deal with such evils are considered in the light of principle and reason, the real question is not where the indignity occurred, but whether it related to the discharge of duty, and has the evil consequences in the administra-tion of justice to which we have adverted. If these results follow, it is not at all material, so long as the judge is assailed for official acts, where the judge is at the time of the assault, nor whether he is then engaged in the discharge of any duty, nor whether the court is then sitting, nor whether the assault was with reference to a past, instead of a pending case. These things are not of the essence of the offense and evil." In Burdett v. Commonwealth,

103 Va. 338 (48 S. E. 878, 68 L. R. A. 251, 106 Am. St. R. 916), Burdett was charged with contempt in writing and publishing in a newspaper an article severely arraigning the conduct of the county judge in disposing of some indictments against him to which he had pleaded guilty.  He contended that as the cases were ended, he was not in contempt for commenting upon the conduct of the judge, however offensive the communication might have been.  The Supreme Court of Appeals said:  "In the nature of things, why should not defamatory and scandalous criticisms upon a court or judge with respect to an ended cause be punished as for a contempt?  It is true that it can no longer injure the particular litigant, but it degrades the administration of justice by bringing the courts and judges into disrepute."

One of the most thoroughly considered cases to which our attention has been directed is that of State *v.* Shepherd, 177 Mo. 205 (99 Am. St. R. 624, 76 S. W. 79).  After a most exhaustive examination of the authorities, both English and American, the conclusion was reached that "scandalizing a court itself is a criminal contempt, and the contempt need not relate to a cause that is still pending."  The attachment for contempt in that case was directed against the publisher of a newspaper, and arose out of an article which seriously and offensively reflected upon the integrity of the judges of the Supreme Court of Missouri and the motives which actuated them in deciding a case which had been finally disposed of.  It is interesting to note that while the case to which the criticism was directed was decided by a divided bench, the judges were unanimous in adjudging the publisher of the newspaper article guilty of contempt.  In the course of the very able opinion, delivered by Judge Marshall, the court, after referring to Lord Hardwicke's definition of contempt in the case against the printer of the St. James Evening Post, said (p. 229):  "It will be observed that the first kind of contempt spoken of, to wit, *scandalizing the court itself,* is a matter wherein the State, the people, and the court are vitally interested.  It is, therefore, a public matter, and hence is a criminal contempt.  The other two kinds of contempts spoken of are such as directly affect a party litigant, and at the same time affect the public generally only in so far as it is of importance 'to keep the streams of justice clear and pure.'  Blackstone also makes the same distinction, and defines contempts, inter alia, to consist

in 'speaking or writing contemptuously of the court or judges, acting in their official capacity:' 4 Blackstone's Commentaries, 285. This distinction has been overlooked in some of the adjudicated cases, and hence the error they have fallen into of saying that the contempt must relate to a cause that is still pending, and if the cause is disposed of, that will be no contempt which would have been a contempt if it had occurred while the cause was pending. The theory of such cases is that the act had a tendency to injuriously affect the rights of a party litigant in a pending litigation, or had a tendency to embarrass, although it might not actually influence, the court in the determination of a pending cause. It must be obvious to the discriminating mind that such cases fall properly under the second or third classes pointed out by Lord Hardwicke, supra, but that they do not cover the whole field, for there is still the first kind of a contempt, to wit, scandalizing the court itself, in which the public is primarily interested, and as to which the injury is just as great whether it referred to a particular pending case, or only to the court as an instrumentality of government." In State v. Morrill, 16 Ark. 384, it was held: "By the common law, courts possessed the power to punish, as for contempt, libelous publications upon their proceedings, pending or past, tending to degrade the tribunals, destroy that public confidence and respect for their judgments and decrees, so essential to the good order and well being of society, and to obstruct the free course of justice." Chadwick's case, 109 Mich. 588 (67 N. W. 1071), was another case of contempt for the writing and publication in a newspaper of a scandalous communication in reference to the court. In that case one of the defenses was that the case to which the article referred was not pending, but the court held: "The power of a court of record to punish for contempt persons guilty of vilifying the court in its judicial character is not limited to contempts arising out of pending proceedings." The line of distinction at common law in reference to contempts is thus well expressed in Neel v. State, 4 Eng. (Ark.) 259 (50 Am. D. 209): "By the common law, a court may punish for contemptuous conduct toward the tribunal, its process, the presiding judge, or for indignities to the judge while engaged in the performance of judicial duties in vacation, or for insults offered him in consequence of judicial acts; but indignities offered to the person of the judge in vacation, when not

engaged in judicial business, and without reference to his official conduct, are not punishable as contempts." In the English case In re Crawford, 18 L. J. Com. Law (N. S.), 225, a proceeding for contempt was instituted against the writer of a newspaper article tending to defame and scandalize the court. It was held: "Every tribunal has the power of committing those who treat it with contempt; and the question whether a contempt has or has not been committed is for the sole decision of that court itself. A libel, reflecting contemptuously on the proceedings of a court, published while the court is not sitting, may be punished by immediate commitment, as well as such a contempt committed in its face and sedente curia."

The authorities have been examined at some length for the purpose of showing that it is no new question with which we are called upon to deal, and that the courts from the earliest times have found it necessary to vindicate their dignity and authority by summary punishment for contempt. We have also endeavored to make it clear that the purpose in so doing has been to aid in the administration of the law. A judge who would use his power to punish for a personal affront would himself be contemptible. In the nature of things there can be no valid distinction as to this matter between pending and past proceedings. If the case be pending, a contemptuous writing in reference to the conduct of the court may have a tendency or be designed to influence a decision in the particular cause, but this merely aggravates the contempt. So far as the effect on the court and the administration of the law generally is concerned, the result is the same in both cases. If it be said of a judge that all of the decisions which he rendered in the past were based upon unworthy and corrupt motives, this does not differ substantially from the statement that all of the decisions which he will render this year, as well as those in causes then depending, will be based upon like motives. Both equally tend to bring the court into disrepute, hold the judge up to public contempt, and cause the people to distrust the agency appointed by them to administer the law. Indeed, the latter is more harmful than the former, because the former is history, and there are criteria by which its truth or falsity may be judged, while the latter is prophecy, and its baneful effects are harder to counteract. If it be contempt to scandalize the court and bring the administration

of the law into disrepute, then it makes no difference whether the scandalous conduct be in reference to pending or past proceedings.

This much has been said in order that my position upon the contention of counsel for the respondent may be made plain; but there can be no doubt that the language of the respondent was written with reference to a pending case. The Court of Appeals has jurisdiction to review the decisions of the trial courts in all criminal cases except convictions in capital felonies. The effect of the judgment of this court in the *McCullough* case was to send it back for another trial. If the accused should be again convicted, the judgment could be again reviewed in this court. But the case was pending in a more specific sense than this. Cases are pending "as long as any proceedings can be taken." Oswald, Contempt of Court, 97. The term had not adjourned, the remittitur had not been sent down. The judgment was "in the breast of the court." There are precedents in this court for entertaining a motion for a rehearing filed by the State in a criminal case. But be this as it may, the judgment was subject to be modified or even vacated ex mero motu. The case was therefore, even in a technical sense, still pending in this court, and the language of the respondent was used in reference to a pending case.

3. But it is said that the respondent had a right to publish the article, under his constitutional guaranty of freedom of speech. Our Bill of Rights provides that "no law shall ever be passed to curtail or restrain the liberty of speech, or of the press; any person may speak, write, and publish his sentiments on all subjects, *being responsible for the abuse of that liberty.*" Civil Code (1910), § 6371. The constitution guarantees liberty, not license. There are no absolute rights. Even the right to live may be forfeited. All our so-called rights, privileges, and liberties are to be enjoyed in subordination to the public good. One may speak or write freely, but he may not slander or libel his neighbor. If he libel a judge as an individual, he is amenable to both the civil and the criminal law. If he libel a judge in relation to his official conduct, he is not only subject to prosecution and to an action for damages, but also to punishment for contempt. *Bradley* v. *State,* supra. Even privileged communications may be abused. One may plead his privilege, but he can not excuse an abuse of it. The constitution no more intended to exempt the libeler from punishment for

contempt in a proper case than from other remedies, both corrective and compensatory, that might be pursued. In this connection I take the liberty of quoting from the remarks of Judge Samuel B. Adams, one of the distinguished members of the bar of this court, whom the court called to its assistance in the determination of the important and delicate questions involved in this case. Before quoting this extract I trust it is not out of place for me to say that the people of Georgia owe to Judge Adams and his colleague, Judge Andrew J. Cobb, a debt of gratitude for their defense of the courts—the people's institutions, and for the lofty and patriotic sentiments expressed by them. On the subject of freedom of speech Judge Adams, in part, said: "Legal objection can not be made to the respectful criticism of the views of a court. Every citizen has that right. A judge whose decision is reversed by an appellate court may go into the newspaper and criticise the views of the court in a respectful way. Such conduct would raise questions of good taste and propriety. Most well-instructed men would say that the only dignified course of the trial judge is to obey the decision of the tribunal which the fundamental law of the land makes his reviewing court, and to which that fundamental law, which he is bound to obey, gives the right of reversal. These appellate courts have the right to reverse, whatever their reasons. They do their duty as they see it, and the plain duty of the trial court is to respect their decisions and carry them out. But there is no law, there can be no principle of sound policy, which permits the judge of the lower court, because his decision is reversed, or for any other reason, to impugn the honor, the integrity, or the good faith of the appellate court. Such conduct involves not only bad taste, but the violation of plain duty and plain right."

On the subject of the liberty of the press and the right of newspapers to comment upon judicial proceedings, see *Wynn* v. *City & Suburban Railway*, 91 *Ga.* 344 (17 S. E. 649). In speaking upon this subject Judge Cooley says: "The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing except so far as such publications, from their blasphemy, obscenity, or scandalous character, may be a public offense, or as by their falsehood and malice they may injuriously affect the standing, reputation, or

pecuniary interest of individuals. Or, to state the same thing in somewhat different words, we understand liberty of speech and of the press to imply not only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords. For these standards we must look to the common-law rules which were in force when the constitutional guaranties were established, and in reference to which they have been adopted." Cooley's Constitutional Limitations (7th ed.), 604, 605. Alexander Hamilton, in his brief in a celebrated case, said that liberty of the press "consists in the right to publish, with impunity, truth, with good'motives and for justifiable ends, whether it respects government, magistracy, or individuals." And Chancellor Kent said that this definition was perfectly correct, comprehensive, and accurate. People v. Croswell, 3 John. Cas. 336, 394. See, also, *Pavesich* v. *New England Life Ins. Co.*, 122 *Ga.* 190, 202 (50 S. E. 68, 69 L. R. A. 101, 106 Am. St. R. 104, 2 Ann. Cas. 561), where Mr. Justice Cobb discusses this question at some length. In State v. Shepherd, cited supra, a very comprehensive discussion of this subject will be found. From it we quote the following: "This is the true rule. The liberty of the press means that anyone can publish anything he pleases, but he is liable for the abuse of. this liberty. If he does this by scandalizing the courts of his country, he is liable to be punished for contempt. If he slanders his fellow-men, he is liable to a criminal prosecution for libel, and to respond, civilly, in damages for the injury he does to the individual. In other words, the abuse of the privilege consists, principally, in not telling the truth." In State v. Morrill, supra, the Supreme Court of Arkansas said: "Any citizen has a right to comment upon the proceedings and decisions of this court, to discuss their correctness, and the fitness or unfitness of the judges for their stations, and the fidelity with which they perform the important trusts reposed in them; but he has no right, under the 7th section of the Bill of Rights, to attempt, by libelous publications, to degrade the tribunal, etc. Such publications are an abuse of the liberty of the press, for which he is responsible." This statement of the rule was adopted by the Supreme Court of Appeals of Virginia in Burdett v. Commonwealth, supra. It must be apparent from these authorities that the respondent can not find

shelter under that section of the Bill of Rights which guarantees freedom of speech and of the press.

The suggestion was made that the respondent ought not to be punished, because he himself occupies high judicial station, and that it would be unseemly to adjudge him in contempt. One of his counsel remarked in the argument that this was the first time in the history of Georgia that a judge of the superior court had been haled before another judicial tribunal for contempt. The counsel might well have added that, to the credit of the Georgia judiciary, it might also be said that this was the first instance where a nisi prius judge had in the public prints arraigned a reviewing court for a reversal of one of his decisions, and ascribed to it motives so base and unworthy as the language of the article written by the respondent implies. No man, no matter how high his station, is exempt from punishment for crime. A contempt of this character is criminal in its nature. Indeed, Blackstone, in enumerating the classes of contempts, places at the head of the list "those committed by inferior judges and magistrates; by acting unjustly, oppressively, or irregularly, in administering those portions of justice which are intrusted to their discretion, by proceeding in a cause after it is put a stop to or removed by writ of prohibition, certiorari, error, supersedeas and the like." 4 Bl. Com. 284. See, also, Oswald, Contempt of Court, 73; Rapalje on Contempt, § 54. If a judicial officer can be guilty of this kind of contempt, there is no good reason why he is not, like any other individual, amenable to punishment for other kinds of contempt. See In re Breen, 30 Nev. 164, 186 (93 Pac. 997, 1004). The respondent not only can not claim immunity on account of his official position, but rather does it aggravate his offense. There is no office in Georgia of greater importance or power than that of judge of the superior court. He comes into direct contact with the public. He can have great influence for good, or he can by his example impair the respect of the people for the law and the constituted authorities to such an extent as almost to bring about a state of anarchy. The judges of the superior courts of Georgia from the earliest times to the present day have generally been moulders of public sentiment in their respective communities. In illustration of this, Judge Cobb in his splendid argument before this court in the present case called attention to the remarkable influence for good which

was exerted by Judge Herschel V. Johnson during his incumbency of the bench in the Middle Circuit. I have said this not so much in criticism of the respondent or as an insinuation that he is not in favor of law and order, but rather for the purpose of showing what a tremendous effect the widely circulated public opinion of a man occupying his high official station may have. Ours is a representative form of government. Our affairs are managed by authorities appointed either directly by the people themselves or through agencies designated by them. Popular government is absolutely dependent upon the authorities constituted to administer governmental affairs. If we destroy the confidence and respect of the people in the tribunals designated by them to administer the law, we stand face to face with anarchy. How important it is, therefore, that one occupying the high and honorable station of judge of the Superior Court should by his example and by his every word inculcate in the public mind respect for and obedience to not only the law, but the authorities appointed to administer it. For these reasons, the offense of the respondent is graver than if he had occupied simply a private station, with such influence as the ordinary private individual may have.

4. This brings me to consider whether, upon legal principles, the article written by the respondent subjects him to punishment for contempt by this court. This must be determined from the language used; it is not a question of intention. Cartwright's case, 114 Mass. 230.

The case of *McCullough* v. *State* was twice before this court, and each time the judgment overruling the motion for a new trial was reversed. The first decision was rendered before the writer of this opinion came upon the bench, and the opinion in the second case was prepared for the court by the writer. It is not my purpose to discuss the merits of that decision. The opinion speaks for itself. Suffice it to say that I then thought it was right, and I am of the same opinion still. With great deliberation I make the assertion that no fair-minded man can read the record in the *McCullough* case without grave doubt of the defendant's guilt of the crime of which he was convicted; and I think the opinion of the court clearly demonstrates that the trial judge committed errors of law which entitled the accused to a new trial. But whether the decision was right or wrong is apart from the question.

We do not claim to be infallible. We often make mistakes. But the respondent, whatever may have been his opinion as to the correctness of the decision, went beyond his rights when he publicly attacked the motives and integrity of the Judges who rendered it.

There was placed before us on the morning of October 5th the article which is the basis of this proceeding, over the signature of the respondent, published in one of the great daily newspapers of the State, having a wide circulation. In this article the respondent states that the decision in the *McCullough* case is based upon "a pitiful misconception and misconstruction of the record," and indicates the inability of the court to comprehend the record and render a proper decision in the case "if they so desired." Here then is a distinct intimation that this court may not have desired and probably did not desire to render a correct decision in the case. Further, it is averred that this court frequently reverses the Supreme Court "with great complacency." Our oath of office requires us to follow the Supreme Court decisions as precedents. We are charged with not only frequently violating this oath of office, but with taking pleasure in so doing. The respondent refers to the grounds of reversal as "alleged and frivolous reasons;" and, after stating that the facts of the case are not correctly reported in the newspaper, but that he is sure the newspaper reporter "did not mean to prejudice the case in favor of the negro," he adds that he fears the Court of Appeals has either *"wittingly* or unwittingly" done so. The article concludes with these words: "The real reason for the reversals has never been given. The truth is that the Court of Appeals don't believe that a negro should be punished twenty years in the penitentiary for an assault to rape on the wife of a humble farmer, but I put them on notice that I do not agree with them, and that I will continue to do my duty as long as the juries continue to do their duties." In this extract is a direct charge that the court did not in the opinion give the "real reason" for the reversal. A more serious charge could scarcely be brought against a reviewing court than that it gave feigned reasons for its judgment, and, from cowardice or other unworthy motive, withheld the "real reason" for its decision. The respondent charges that the "real reason" is that the Judges of this court do not believe in the maximum punishment of twenty years for a black brute who attempts to rape a virtuous white woman; this,

too, after the contention of the accused that the sentence was excessive had been expressly overruled by this court in the decision. The article was a palpable attempt to arouse popular feeling against this court and bring it into contempt, by charging not only that it gave false reasons for its decision, but that the true reason, which it thereby sought to conceal, was that the members of the court regarded lightly assault with intent to rape by a negro upon a white woman,—a crime which always inflames popular indignation to the utmost, and for which no punishment could be too severe. Is it conceivable that the respondent himself believed his accusation to be true? If not, how inexcusable the charge and how flagrant his offense!

Shall the sworn ministers of the law, because of the gravity of the charge, rape justice in her very temple? Shall we forget our oaths of office, our duty to the law, and bid the mob enter the sanctuary of our mistress, and let anarchy reign? Is a man charged with this awful crime not entitled to a fair trial? How else shall his guilt be established? By what criteria shall he be judged, if not by the rules of law, administered in an orderly and impartial way? We are told that crime is on the increase. Can it be checked by impairing the confidence of the people in the agencies appointed by them for this purpose? Instead of making an unworthy and dangerous appeal not only to race but to class prejudice as well, the respondent should at most have said, if he said anything, that "while I do not agree to the legal principles announced by the court, it is my duty and the duty of every law-abiding citizen to respect the decision. If it is wrong, it can be reversed or modified in the manner prescribed by law." This would have been a much more becoming attitude and one more conducive to the welfare of society, one of whose guardians the respondent has been for a period of sixteen years. For myself I wish to go on record here and now for all time as being in favor of the orderly administration of the law in all cases. As a judge I know but one law for the rich and the poor, the powerful, the defenseless, and the oppressed. I am not responsible for the consequences which may result from an application of the law. A judge who, knowing his duty, does not dare discharge it is unworthy of his high office, the judicial ermine should be stripped from him, and he should pass into oblivion.

5. Tested by the rules and authorities above cited, is there room for doubt that the respondent is in contempt? The article is a libel upon the individual Judges, but it also impugns their official conduct, in effect charges them with a violation of their oaths of office, and with being actuated in their ·official capacity with motives as base and unworthy as the human mind could conceive. If what the respondent says is true, we should not only be driven from office, but we deserve the execration of all mankind. If what he says is untrue, he has abused the liberty of speech guaranteed him by the constitution, and is subject to be dealt with as for contempt. Under our conception of our duty, we feel constrained to adjudge the respondent in contempt.

Had the respondent answered that his conduct was hasty and ill-advised, and asked leave to withdraw the offensive language, he might have purged himself of contempt. But his answer rather aggravates the contempt. He in effect says: "I made the charges, I do not withdraw them, but I did not mean to reflect upon the integrity of the court." Such an answer presents no defense. In re Woolley, 11 Ky. 95. Moreover, the animus of the respondent is illustrated by the repetition of the contempt, in the article of October 8th, which appears in the record.

This opinion is perhaps longer than it should have been, but I have thought it due the public that the views entertained by this court be set forth clearly that all may be advised of the disposition of the present incumbents of this bench to uphold the dignity of the high tribunal over which they have been called upon to preside. I can not better conclude than to commend what Georgia's great Chief Justice said of a distinguished nisi prius judge—Judge Marshall J. Clarke, in *Ellison* v. *Georgia Railroad Co.*, 87 *Ga.* 719, 720 (13 S. E. 809, 27 Am. St. R. 242) : "His willingness to abide by authority which ought to control him for the time being, is not the least conspicuous of his many judicial virtues."